[Cite as *State v. Eckenrode*, 2025-Ohio-2387.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## CRAWFORD COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

ANTHONY ECKENRODE,

    DEFENDANT-APPELLANT.

CASE NO. 3-25-01

OPINION AND
JUDGMENT ENTRY

Appeal from Crawford County Common Pleas Court
Trial Court No. 24-CR-0199

Judgment Affirmed

Date of Decision: July 7, 2025

APPEARANCES:

    *Christopher Bazeley* for Appellant

    *Daniel J. Stanley* for Appellee

**WALDICK, P.J.**

{¶1} Defendant-appellant, Anthony Eckenrode ("Eckenrode"), brings this appeal from the December 30, 2024 judgment of the Crawford County Common Pleas court sentencing him to 30 months in prison after he was convicted by a jury of Domestic Violence. On appeal, Eckenrode argues that his conviction was against the weight of the evidence, that body camera footage was improperly admitted into evidence, and that the prosecutor committed misconduct in closing arguments. For the reasons that follow we affirm the judgment of the trial court.

*Background*

{¶2} On July 16, 2024, Eckenrode was indicted for Domestic Violence in violation of R.C. 2919.25(A)/(D)(4), a third degree felony due to Eckenrode having multiple prior domestic violence convictions. It was alleged that Eckenrode struck his live-in girlfriend in the face, resulting in her having a black eye. Eckenrode pled not guilty to the charge.

{¶3} Eckenrode proceeded to a jury trial on December 12-13, 2024. At trial, the State presented evidence that on July 3, 2024, at 9:53 p.m., an anonymous call was placed to the Bucyrus Police Department requesting a welfare check on a woman named Michelle who lived with Eckenrode in Bucyrus. The male caller suggested that there was possible elder abuse or possible domestic violence because Michelle had a black eye.

-2-

{¶4} Due to holiday fireworks being set off nearby, it was nearly an hour before two officers arrived to check on Michelle. The officers approached the front of the residence but were told that Michelle lived in the upstairs apartment. The officers then approached the entrance to the upstairs apartment and knocked. Eventually Eckenrode answered. Eckenrode stated that they had not called for a welfare check but when officers insisted that they be able to see Michelle, Eckenrode went inside to get her.

{¶5} Michelle came outside with a visible black eye. When officers asked her what happened, Michelle claimed that Eckenrode had "sucker punched" her in the face around 6:30 a.m. Michelle stated that she and Eckenrode had gotten into an argument that led to a physical altercation. She stated that Eckenrode dragged her through the house by the hair and that she had some other minor scrapes from the altercation. Michelle was visibly distraught as she told her story, crying and shaking.

{¶6} Michelle told the officers that "everyone" wants her to press charges but she was worried about Eckenrode getting in trouble. She indicated she wanted the physical violence to stop. She ultimately did not want to "press charges."

{¶7} One of the officers indicated that, regardless of Michelle's wishes, he was going to arrest Eckenrode. The officers went inside the residence and spoke with Eckenrode, who was seated on his couch. Eckenrode initially stated he did not know what happened to Michelle. Then he stated Michelle woke him up that morning and started an argument. Eckenrode indicated he had been drinking heavily

the night prior. He claimed that as he was walking toward Michelle at one point, he tripped and fell. He claimed that his head accidentally hit Michelle in the eye.

{¶8} Eckenrode stated he felt bad about the situation, that he did not remember "any of it," but that it was an accident. He specifically denied punching or striking Michelle.

{¶9} One of the two officers who responded to do the welfare check testified at trial. The interaction between law enforcement officers, Eckenrode, and Michelle was recorded on a body camera and presented to the jury.

{¶10} After the State presented evidence related to Eckenrode's prior domestic violence convictions in 2008 and 2012, a recess was taken. When court reconvened, the State indicated it had planned to present Michelle's testimony, but the State had learned that Michelle did not want to testify. The State was under the impression that Michelle wanted to invoke her "right to remain silent." Although the State did not feel Michelle had cause to invoke her Fifth Amendment rights as the victim in this matter, the State nonetheless had a document drafted providing immunity to Michelle for any testimony concerning the events between July 2, 2024, and July 4, 2024.

{¶11} Michelle was brought into the courtroom, outside the presence of the jury, and she indicated that she was not worried that her testimony might incriminate her; rather, she did not want to testify against her "mate." The trial court took another recess so the parties could research whether Michelle could assert any type

of spousal privilege despite not being married to Eckenrode. Ultimately the trial court determined that Michelle could not assert a spousal privilege because she was not Eckenrode's spouse and, in any event, the privilege would not cover physical criminal acts against her. Michelle still refused to testify and she was held in contempt by the trial court.

{¶12} The trial court had Michelle indicate in front of the jury that she was refusing to testify despite being subpoenaed. Afterward, the State rested its case.

{¶13} Outside the presence of the jury, defense counsel raised an issue with Michelle's statements that had been played on the body camera footage. He indicated he was not expecting Michelle to refuse to testify, so her statements that were made on the body camera footage now could not be confronted under the confrontation clause and those statements constituted inadmissible hearsay.

{¶14} The parties discussed the issue and the trial court determined that Michelle's initial statements to the police were not testimonial and that they constituted excited utterances given her demeanor at the time. However, the trial court indicated that a subsequent conversation between the officers and Michelle after Eckenrode had been arrested was testimonial and was inadmissible. The trial court had the body camera footage redacted to remove the later conversation and the jury was instructed not to consider it.

{¶15} On the second day of trial, Eckenrode testified on his own behalf. He indicated he had lived with Michelle for 14 years. He testified that prior to the

incident he had consumed 12 or 13 beers with his neighbor and Michelle, who was also drinking, then he went to sleep. He testified he was awakened by Michelle around 6:30 a.m., with Michelle accusing Eckenrode of talking to a woman from a prior relationship.

{¶16} Eckenrode testified he was "not really coherent. So I started to go after her, but I didn't touch her." (Tr. at 145). He testified at one point he "tripped or stumbled" and as Michelle was coming back towards him, his head hit her. He testified he went back to bed and did not realize how bad the injury was until later. He specifically denied striking her. He testified he knew his story was "farfetched" but said that was how it happened. He testified he was not a violent person and he had not actually committed the crimes he had been convicted of in the past. He testified he only pled guilty to the prior crimes to keep his job.

{¶17} Eckenrode then presented the testimony of his neighbor, who testified that he did not know Eckenrode's reputation in the community for truthfulness, but that Eckenrode had always been honest with him. Eckenrode presented the testimony of another individual who used to live near Eckenrode and Michelle. She testified that Michelle had a reputation for being a liar. Finally, Eckenrode presented the testimony of a neighbor and former coworker who testified that Eckenrode was an honest person. However, the witness testified that on the date of the alleged incident, she received a message from Michelle showing her black eye.

{¶18} The jury found Eckenrode guilty as charged. On December 30, 2024, he was sentenced to serve 30 months in prison. It is from this judgment that he appeals, asserting the following assignments of error for our review.

### First Assignment of Error

**The State engaged in prosecutorial misconduct when it referred to Eckenrode as a "liar" five times during closing argument and accused him of "lying to the judge" in the past when he pled guilty to domestic violence charges even though he denied that he committed the acts.**

### Second Assignment of Error

**Eckenrode's Conviction is not supported by the weight of the evidence presented at trial.**

### Third Assignment of Error

**The trial court erred when it held that the video containing** [Michelle's] **Statements to police was admissible under the excited utterance exception to the hearsay rule.**

{¶19} For ease of discussion, we elect to address the assignments of error out of the order in which they were raised.

*Second Assignment of Error*

{¶20} In his second assignment of error, Eckenrode argues that his Domestic Violence conviction was against the manifest weight of the evidence.

## Standard of Review

**{¶21}** When reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 1997-Ohio-52. In doing so, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

## Controlling statute

**{¶22}** Eckenrode was convicted of Domestic Violence in violation of R.C. 2919.25(A)/(D)(4), which reads:

> (A) No person shall knowingly cause or attempt to cause physical harm to a family or household member.
>
> . . .
>
> [D](4) If the offender previously has . . . been convicted of two or more offenses of domestic violence . . . a violation of division (A) or (B) of this section is a felony of the third degree[.]

Analysis

{¶23} Eckenrode concedes that Michelle was a family or household member and that she suffered an injury. However, he argues that the evidence did not support a finding that he "knowingly" caused physical harm to Michelle.

{¶24} More specifically, Eckenrode contends that Michelle's statements to police officers were not reliable because they were unsworn. He argues that he presented the testimony of multiple witnesses who all indicated that Eckenrode was an honest person and Michelle was not. He argues that Michelle was accidentally struck in the face and that was actually supported by a statement Michelle made to police that at one point Eckenrode had "headbutted" her in the face.

{¶25} Contrary to his argument, one of the officers present at the scene who spoke with Michelle testified that Michelle indicated she had been struck by Eckenrode's head on the other side of her face. Michelle clearly stated to the officers on the body camera that Eckenrode "sucker punched" her in the eye.

{¶26} Moreover, Michelle's black eye was readily visible on the body camera footage. Her anxious and agitated state was also visible. Further, she was alone with Eckenrode when the police came, and Michelle had sent photographs of her injury to other people, including one of Eckenrode's witnesses on the date of the incident.

{¶27} As to Eckenrode's story that it was all an accident, the trier-of-fact is free to believe or disbelieve any or all of a witness's testimony, including a

defendant's attempt to minimize his conduct. *State v. Jones*, 2022-Ohio-2089, ¶ 28 (3d Dist.). Eckenrode repeatedly attempted to minimize his past conduct by stating he did not commit the actions he had previously been convicted of, which could readily lead a jury to believe his denials were not credible in this instance.

**{¶28}** Based on the evidence presented at trial, and the jury's ability to evaluate Eckenrode's credibility, we do not find that this is one of the "exceptional" cases where the evidence weighs heavily against the conviction. Therefore, Eckenrode's second assignment of error is overruled.

*Third Assignment of Error*

**{¶29}** In his third assignment of error, Eckenrode argues that it was error for the trial court to find that Michelle's initial statements to police were admissible under the "excited utterance" exception to the hearsay rule.

Standard of Review

**{¶30}** "Generally, a trial court has broad discretion with respect to the admission of evidence." *State v. Delong*, 2022-Ohio-4233, ¶ 6 (3d Dist.), citing *State v. Conway*, 2006-Ohio-2815, ¶ 62. "Accordingly, we will not disturb the trial court's evidentiary rulings absent an abuse of discretion that produces a material prejudice to the aggrieved party." *Id.* An abuse of discretion is "an unreasonable, arbitrary, or unconscionable use of discretion, or . . . a view or action that no

conscientious judge could honestly have taken." *State v. Brady*, 2008-Ohio-4493, ¶ 23.

Relevant Authority

**{¶31}** " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). Hearsay is not admissible unless an exception applies. Evid.R. 802. Under Evid.R. 803(2), an excited utterance, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," is "not excluded by the hearsay rule, even though the declarant is available as a witness[.]"

**{¶32}** A four-part test is applied to determine whether a statement is admissible as an excited utterance; the requirements for admissibility are:

> (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his [or her] reflective faculties and thereby make his [or her] statements and declarations the unreflective and sincere expression of his [or her] actual impressions and beliefs, and thus render his [or her] statement of declaration spontaneous and unreflective,

> (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his [or her] reflective faculties so that such domination continued to remain sufficient to make [the] statements and declarations the unreflective and sincere expression of his [or her] actual impressions and beliefs,

(c) that the statement or declaration related to such startling occurrence or the circumstances of such starling occurrence, and

(d) that the declarant had an opportunity to observe personally the matters asserted in [the] statement or declaration.

(Emphasis deleted.) *State v. Jones*, 2012-Ohio-5677, ¶ 166, quoting *Potter v. Baker*, 162 Ohio St. 488 (1955), paragraph two of the syllabus.

**{¶33}** "There is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance." *State v. Taylor*, 66 Ohio St.3d 295 (1993). "The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be a result of reflective thought." (Emphasis sic.) *Id.* "Therefore the passage of time between the statement and the event is relevant but not dispositive * * *." *Id.* " '[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation.' " *Id.*, quoting *State v. Duncan*, 53 Ohio St.2d 215, 219-220 (1978). In addition,

admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties.

*Jones* at ¶ 170, quoting *State v. Wallace*, 37 Ohio St.3d 87 (1988), paragraph two of the syllabus.

Analysis

**{¶34}** Eckenrode argues that even assuming he did assault Michelle, she could not still be under the excitement caused by the assault more than half a day later such that her statements to police constituted excited utterances. He argues that fourteen hours "was enough time for [Michelle] to engage in reflective thought on what she wanted to say happened." Further, he argues that the Supreme Court of Ohio has indicated that merely being "upset" does not meet the standard for admissibility as an "excited utterance." *State v. Taylor*, 66 Ohio St.3d 295, 303 (1993).

**{¶35}** After permitting the parties to argue the issue at trial, the trial court conducted a lengthy analysis on the record, reasoning as follows:

> The – it was later, it wasn't right after that incident happened. All right. So one might say, well, it's not an excited utterance. However, however, I will say this, the police show up, am I right, as a result of a call made by a relative, daughter is what it is. And the defendant is – or not defendant, I'm sorry, [Michelle], is very agitated about, about what's going on. Very agitated.
>
> Very upset, crying. Surprised to see the police. All right. So at that point, you know, one thing about the video, you can see the body language, you can see all that sort of stuff. Her body language, the way she spoke, all those things, certainly would qualify as an excited utterance. And I would say the initial – you know, the initial 15 or so minutes may be of the conversation she was very agitated, very upset, crying, confused a little bit because she was shaking.

**{¶36}** I think that qualifies as an excited utterance.

-13-

(Tr. at 93-94).

**{¶37}** Later, the trial court again discussed the excited utterance issue, stating as follows:

> There's two ways to look at that situation. It's 14 hours later, that's one way to look at it. Or number one, she was trying to get someone to call the police to help her and she was trapped in the house with the guy for 14 hours. And when she finally walked out of the house, all that emotion came out. And I think that's a fair interpretation that someone could make.
>
> And it was clearly [sic] that she was, you know, under, my opinion, great mental duress or upset when she made that. But I'm not here to revisit the issue

(Tr. at 137-138).

**{¶38}** The trial court's analysis reflects consideration of the requirements for admissibility of an excited utterance. The violent incident would classify as a startling occurrence. The fact that the police came to the house without being called by Michelle meant their arrival was somewhat of a surprise. This indicates Michelle would have had less time in the moment to consider her story. Further, unlike other instances of an "excited utterance," Michelle's demeanor was directly visible on the video recording. We can find no abuse of discretion with the trial court's determination that Michelle was agitated, upset, shaking, and crying.

**{¶39}** Although Eckenrode is correct that merely being "upset" does not meet the standard for admissibility under *Taylor*, *supra*, the trial court's findings go

beyond Michelle being "upset." Moreover, although the time frame in this case was significant, courts have upheld longer gaps between an incident an excited utterance. *See State v. Chappell*, 97 Ohio App.3d 515, 591 (8th Dist. 1994) (finding a nine-year-old's statement to her grandmother qualified as an excited utterance even though it was made 32 hours after being raped). Although the facts of *Chappell* are different, here the trial court was able to directly observe the victim's demeanor and her state of mind when she was making the "excited utterances."

**{¶40}** After reviewing the record and the arguments of the parties, we do not find that the trial court abused its discretion by determining that Michelle's initial statements to police constituted an "excited utterance" based on the particular facts and circumstances of this case. Therefore, Eckenrode's third assignment of error is overruled.

### *First Assignment of Error*

**{¶41}** In his first assignment of error, Eckenrode argues that the prosecutor committed misconduct during closing arguments by referring to him as a "liar" on five different occasions during closing arguments.

### Relevant Authority

**{¶42}** Courts afford prosecutors wide latitude in closing arguments, and prosecutors may draw reasonable inferences from the evidence at trial, commenting on those inferences during closing arguments. *State v. Hunt*, 2013-Ohio-5326, ¶ 18

(10th Dist.); *State v. Little*, 2016-Ohio-8398, ¶ 30 (3d Dist.). The test for prosecutorial misconduct in closing arguments "is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14 (1984), citing *United States v. Dorr*, 636 F.2d 117 (5th Cir. 1981). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Thus, prosecutorial misconduct is not grounds for reversal unless the defendant has been denied a fair trial. *State v. Maurer*, 15 Ohio St.3d 239, 266 (1984).

{¶43} Here, Eckenrode concedes that he did not object to the prosecutor's statements and thus has forfeited all but plain error. "A court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice." *State v. Pilgrim*, 2009-Ohio-5357, ¶ 58 (10th Dist.); *Little*, *supra* at ¶ 31.

{¶44} For an error to be "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule; (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings; and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Specific to allegations of prosecutorial misconduct, plain error exists

only if it is clear that the defendant would not have been convicted in the absence of the improper comments. *Little* at ¶ 32.

Analysis

**{¶45}** Eckenrode argues that the prosecutor committed misconduct five separate times during closing arguments by indicating that Eckenrode was lying. Generally, it is improper for an attorney to express his "personal belief" or opinion as to the credibility of a witness or as to the guilt of the accused. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). It is improper for a prosecutor to state that he believes a defendant is lying. *State v. Baldev*, 2005-Ohio-2369, ¶ 20 (12th Dist.). However, a prosecutor can indicate that the evidence supports the conclusion that a defendant is lying or not telling the truth. *State v. Draughn*, 76 Ohio App.3d 664, 670 (5th Dist.1992).

**{¶46}** In order to address Eckenrode's assignment of error, we must look at each of the alleged instances of misconduct in context to determine if the prosecutor was expressing a personal belief, or if the prosecutor was simply indicating what the evidence supports. The first instance of purported misconduct occurred when the prosecutor stated the following:

> And he knew what time it was when the cops came upstairs. He was sitting down. He's been through this. This is not his first rodeo. And his whole story was a lot of I don't remember and I didn't do anything on purpose. But I feel real bad. Over and over circular back and forth.

I'm going to kill myself. No I didn't say anything. You heard that. That was a complete lie when he was testifying.

(Tr. at 207-208).

**{¶47}** During this segment, the prosecutor is referring to statements that Eckenrode made to police after the police told Eckenrode he was under arrest. At that time, Eckenrode stated that he was going to kill himself. The cops asked him to repeat himself and he said he did not say anything. He was asked by the prosecutor on the witness stand if he heard himself state on the video that he was going to kill himself, and Eckenrode said he did not, even though it was plainly audible on the body camera footage. Although the prosecutor could have phrased his message differently, it is not unreasonable to suggest the defendant is lying when he says he cannot hear himself on a video when anyone else listening to the video could hear it. Thus we find no error with this segment, let alone plain error.

**{¶48}** Next, Eckenrode argues that the prosecutor committed misconduct during the following segment of closing arguments:

And when he testified and brought his character in issue, you heard about his character. You heard about the past violence. When he said I'm not a violent person, you heard that was a total lie.

(Tr. at 207).

**{¶49}** Eckenrode testified on direct examination that he was not a violent person. The prosecutor then confronted him with the fact that he had numerous prior

-18-

convictions for violent acts. The prosecutor's statement in closing argument was a reasonable characterization of the evidence. *See State v. Lawson*, 2001 WL 433121 (12th Dist.) We find no error here, let alone plain error.

{¶50} Eckenrode next contends that the prosecutor committed misconduct during the following segment of closing arguments:

> Physical harm, drag somebody by the hair is physical harm. Punching somebody in the eye is physical harm. If he headbutts her, that's physical harm. His version is, well, it was an accident. And you can take that or leave it. I would suggest you all the fact, leave that one because that's a total lie too. But even if that isn't a lie, he says I actually did it. She also said he punched me.

(Tr. at 208).

{¶51} Again, although inartfully worded, the prosecutor is suggesting that the evidence supports the conclusion that Eckenrode is lying. This segment does not indicate that the prosecutor is directly giving his personal opinion; rather he is suggesting a conclusion based on the evidence. We find no error here, let alone plain error.

{¶52} In the fourth segment, Eckenrode contends that the prosecutor committed misconduct during the following segment of closing arguments:

> If he also previously had been convicted, twice of domestic violence. He admitted that at least. Even though he said those lies. He was found guilty. Whether he lied and got himself found guilty, it doesn't matter, he was found guilty.

(Tr. at 209).

**{¶53}** During this segment the prosecutor is referring to Eckenrode's testimony that while he had been convicted of multiple prior domestic violence offenses, he claimed he did not actually do them. The prosecutor was simply commenting on the inconsistency of Eckenrode admitting guilt in those cases previously but now claiming he was innocent. We see no error here, let alone plain error.

**{¶54}** Finally, Eckenrode argues that the prosecutor committed misconduct during the following segment of rebuttal closing arguments:

> Instead of going to trial for beating her, he pled guilty and now is telling you that he didn't do it. Why? He wants to get out of trouble. He's telling you that he lied to get out of trouble. But this time he's lying to get out of trouble, he wants you to believe him. You can tell the difference. And you all have the ability to judge credibility.

(Tr. at 221-222).

**{¶55}** Here, the prosecutor is again referring to the fact that Eckenrode tried to diminish his prior convictions by saying he did not actually commit those crimes. The prosecutor is suggesting that because Eckenrode pled guilty to those crimes in the past, he is now lying. The prosecutor is indicating the jury can determine whether Eckenrode is credible, which is not improper. *State v. Johnson*, 2014-Ohio-4750, ¶ 93. We find that the prosecutor's statements are reasonable extrapolations of the evidence. We find no error here, let alone plain error.

**{¶56}** In sum, although the prosecutor could have worded some phrases better to clearly delineate that he was talking about the evidence rather than his personal opinions, we have not found any error here, let alone plain error. Therefore, Eckenrode's first assignment of error is overruled.

*Conclusion*

**{¶57}** Having found no error prejudicial to Eckenrode in the particulars assigned and argued, his assignments of error are overruled and the judgment of the Crawford County Common Pleas Court is affirmed.

*Judgment Affirmed*

**ZIMMERMAN and WILLAMOWSKI, J.J., concur.**

**/jlm**

Case No. 3-25-01

# __JUDGMENT ENTRY__

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.   The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.


Juergen A. Waldick, Judge


William R. Zimmerman, Judge


John R. Willamowski, Judge

DATED:
/jlm