[Cite as *State v. Johnson*, 2014-Ohio-4750.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO.  1-13-45

      v.

JOHNNY F. JOHNSON, JR.,            O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR2012 0414

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:   October 27, 2014

APPEARANCES:

    *F. Stephen Chamberlain* **for Appellant**

    *Terri L. Kohlrieser* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Johnny F. Johnson, Jr. ("Johnson"), appeals the judgment entry of sentence of the Allen County Court of Common Pleas. He argues that the trial court erred by denying his motion to suppress the victim's pretrial identification of him, that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, that counsel for plaintiff-appellee, the State of Ohio ("State"), engaged in prosecutorial misconduct during closing argument, and that the trial court erred by failing to merge for purposes of sentencing his convictions for kidnapping and attempted rape. For the reasons that follow, we affirm in part and reverse in part.

{¶2} On January 17, 2013, the Allen County Grand Jury indicted Johnson on Count One of attempted rape in violation of R.C. 2907.02(A)(2) and 2923.02, a second-degree felony, and on Count Two of kidnapping in violation of R.C. 2905.01(B)(2), a first-degree felony. (Doc. No. 3). The indictment stemmed from a November 28, 2012 incident in which Johnson allegedly attacked the victim, M.F., and attempted to force her to perform fellatio on him under the porch of an abandoned apartment building adjacent to an alley in Lima, Ohio. (*See* July 1-3, 2013 Tr., Vol. Two, at 220-222). Approximately an hour after the alleged incident, M.F. identified Johnson as the person who attempted to force her to perform fellatio. (*See id.* at 227-229).

{¶3} The trial court held an arraignment hearing on January 25, 2013. (*See* Doc. Nos. 6, 70). Johnson entered pleas of not guilty. (Doc. No. 70).

{¶4} On March 1, 2013, Johnson filed a motion to suppress M.F.'s pretrial identification of him, arguing that the one-person "show-up" used to identify him was inherently suggestive. (Doc. No. 18). Johnson requested a hearing on his motion. (*Id.*).

{¶5} On March 18, 2013, the trial court held a hearing on Johnson's motion to suppress. (Mar. 18, 2013 Tr. at 1).

{¶6} The trial court issued a judgment entry on March 19, 2013, denying Johnson's motion to suppress. (Doc. No. 29). The next day, the trial court issued an amended judgment entry "to correct typos." (Doc. No. 30).

{¶7} On July 1, 2, and 3, 2013, a jury trial was held on the indictment. (July 1-3, 2013 Tr., Vol. One, at 2); (Doc. No. 70). The jury found Johnson guilty of both counts in the indictment. (July 1-3, 2013 Tr., Vol. Four, at 643-646); (Doc. Nos. 67, 68). The trial court filed its judgment entry accepting the verdicts on July 3, 2013. (Doc. Nos. 67, 68).

{¶8} The trial court held a sentencing hearing on August 19, 2013. (Aug. 19, 2013 Tr. at 1). At the beginning of the sentencing hearing, the trial court heard argument concerning whether the offenses of which the jury found Johnson guilty—attempted rape and kidnapping—merged under R.C. 2941.25. (*Id.* at 1-9).

The trial court concluded that the offenses did not merge and sentenced Johnson to 8 years imprisonment on Count One and 11 years imprisonment on Count Two, to be served consecutively for an aggregate prison term of 19 years. (*Id.* at 9, 22-23); (Doc. No. 77). The trial court filed its judgment entry of sentence the next day. (Doc. No. 77).

{¶9} On September 16, 2013, Johnson filed a notice of appeal. (Doc. No. 80). He raises four assignments of error for our review.

### Assignment of Error No. I

**That the trial court committed error by overruling the defendant's motion to suppress the pre trial identification of the defendant by a single person show up identification.**

{¶10} In his first assignment of error, Johnson argues that the trial court erred by concluding that M.F.'s show-up identification of Johnson was "reliable and admissible notwithstanding the suggestive nature of the 'show-up.'" (Doc. No. 30). Johnson argues that the trial court "failed to properly consider and weigh the factors and the totality of the circumstances of this case." (Appellant's Brief at 11). He also argues that it was error for the trial court to believe M.F.'s testimony despite "the suggestive nature of having a lone black male in the back of a marked police car shown to a recent attack victim in a post traumatic state." (*Id.* at 13). We disagree.

{¶11} A review of the denial of a motion to suppress involves mixed questions of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See also State v. Carter*, 72 Ohio St.3d 545, 552 (1995).

{¶12} When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

{¶13} A trial court will suppress a pretrial identification only if it is both unnecessarily suggestive and unreliable given the totality of the circumstances. *State v. Frazier*, 3d Dist. Shelby Nos. 17-11-06 and 17-11-07, 2013-Ohio-142, ¶ 54, citing *State v. Manley*, 3d Dist. Allen No. 1-11-04, 2011-Ohio-5082, ¶ 5. "The burden of proving that the identification procedure was suggestive and unreliable rests on the defendant." *Manley* at ¶ 5, citing *State v. Taylor*, 3d Dist. Allen No. 1-03-20, 2003-Ohio-7115, ¶ 32.

{¶14} "[A] one-person 'show-up' identification is inherently suggestive." *State v. Ealy*, 10th Dist. Franklin No. 11AP-750, 2012-Ohio-3336, ¶ 8, citing *State v. Gonzalez*, 10th Dist. Franklin No. 10AP-628, 2011-Ohio-1193, ¶ 9. The Supreme Court of the United States has stated that suggestive identifications are problematic because they increase the likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375 (1972). However, the admission of evidence of a show-up identification, without more, does not violate due process. *Id.*

{¶15} "Even if the original identification procedure was suggestive, the actual identification is still admissible as long as it is reliable." *Manley* at ¶ 5, citing *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243 (1977) and *State v. Moody*, 55 Ohio St.2d 64 (1978). We must therefore determine whether the show-up identification was reliable based on the totality of the circumstances. *Frazier* at ¶ 54, citing *Biggers* at 199. In *Biggers*, the Court listed five factors that a court must consider when evaluating the likelihood of misidentification:

    (1)   the witness's opportunity to view the offender at the time of the

    crime, (2) the witness's degree of attention at the time of the crime,

    (3) the accuracy of the witness's prior description of the offender,

    (4) the witness's level of uncertainty when identifying the suspect at

the confrontation, and (5) the length of time that elapsed between the crime and the confrontation.

*Manley* at ¶ 5, quoting *State v. Monford*, 190 Ohio App.3d 35, 2010-Ohio-4732, ¶ 39 (10th Dist.), citing *Biggers* at 199-200. *See also Frazier* at ¶ 54.

{¶16} In its entry denying Johnson's motion to suppress, the trial court relied on many facts, all of which were supported by competent, credible evidence presented at the suppression hearing. (*See* Doc. No. 30). Two witnesses—M.F. and Officer Amy Glanemann ("Glanemann") of the Lima Police Department— testified at the suppression hearing. M.F. testified that while she was walking home from school on November 28, 2012 between 5:00 and 5:30 p.m., she was approached by a male who came within an arm's length in front of her and asked if he could walk with her. (Mar. 18, 2013 Tr. at 22, 35-36, 41). According to M.F., she declined the male's request, and he said, "Why not do it? Do I look old?" (*Id.* at 23). They walked together for about a block and a half, and M.F. was able to get a look at the male. (*Id.*). M.F. entered a business, The Meeting Place, because she did not want to walk with him. (*Id.*).

{¶17} M.F. testified that after between 10 to 20 minutes, she left The Meeting Place and resumed her walk home, at which point she saw the same male whose face she recognized. (*Id.* at 24). She attempted to ignore him, but he spotted her and ran toward her saying, "Honey, wait up," and, "Why are you

ignoring me?" (*Id.* at 24-25). The male asked M.F. to go to McDonald's with him, and M.F. initially refused, but when he persisted, she agreed and planned to call the police there. (*Id.* at 25).

{¶18} M.F. testified that the male suggested they take a shortcut to McDonald's through an alley. (*Id.* at 25-26). When M.F. told him she did not like alleys, he looked back at her and said, "I wish I knew what someone had done to you to make you like this." (*Id.* at 26). According to M.F., she "let down [her] guard" and agreed to walk down the alley. (*Id.*). M.F. testified that after they walked a couple paces into the alley, the male suggested they take a perpendicular alley to get to the street. (*Id.* at 26-27). According to M.F., the male turned into the perpendicular alley after her, so he was behind her, and she heard him make "like a tripping sound," at which point she turned around to see what happened, and he grabbed her arm and started hitting her. (*Id.* at 27).

{¶19} M.F. testified that after the attack ended, she ran across the street into the Rite Aid Pharmacy ("Rite Aid"), and the clerk there called the police. (*Id.*). According to M.F., from the time she first encountered the male to the time he attacked her, about 20 minutes to a half an hour passed. (*Id.*). M.F. testified that when she first encountered the male, "it was fairly light out," and she could see that the sun was getting close to the horizon. (*Id.* at 27-28). According to M.F., during the encounter, she "had a full look at his face," and "several times during

the conversation he turned his face towards [hers]." (*Id.* at 28). When the police arrived at Rite Aid, M.F. gave them a description of the man's face, approximate weight, and clothing. (*Id.*).

{¶20} M.F.'s father took her to the emergency room at St. Rita's Medical Center ("St. Rita's"). (*Id.* at 29). While there, an officer informed M.F.'s father that the police "had somebody that they wanted [her] to I.D.," and M.F.'s father informed M.F. (*Id.*). M.F. went out to the "archway lit for the ambulances" and saw two police cars and three officers. (*Id.* at 29-30). According to M.F., the area was "well lit." (*Id.* at 30). The police did not speak to M.F. until she got outside. (*Id.* at 29). One of the officers shined a light into one of the cruisers containing a man so M.F. could see the man's face. (*Id.* at 30). M.F. recognized the man as the one who attacked her "as soon as the light was on his face," and she was "very sure" it was him because she recognized his face, and specifically his facial proportions and facial hair. (*Id.* at 30-31, 33). She told one of the officers that she "was a hundred and ten percent sure that that was the bastard." (*Id.* at 30). That officer asked M.F. "three times if [she] was sure that it was him." (*Id.* at 33). M.F. testified that between 10 to 20 minutes elapsed between when she ran into the Rite Aid and when the officers showed her the man in the cruiser. (*Id.* at 34).

{¶21} Glanemann testified that on November 28, 2012 at approximately 5:30 p.m., she and another officer were notified of a possible sexual assault that

occurred near the Rite Aid on Market Street. (*Id.* at 3-5, 9). According to Glanemann, the dispatcher described the suspect as a black male with a goatee, approximately five feet, seven inches tall, about 300 pounds, wearing dark clothing. (*Id.* at 4, 9, 18). Glanemann testified that they located Johnson, who matched the description of the suspect, a few blocks from the Rite Aid, and they took him to St. Rita's "so he could be I.D.'d by the victim." (*Id.* at 5-6, 19-21). According to Glanemann, in the area where the officers were searching, no one else matched the description of the suspect, and she could not recall seeing anyone else in the area. (*Id.* at 19).

{¶22} According to Glanemann, the officers pulled the cruiser underneath the overhang of the emergency room at St. Rita's. (*Id.* at 13). M.F. identified Johnson as the person who attacked her, and she told Glanemann that she "was a hundred and ten percent sure it was him." (*Id.* at 7). Glanemann testified that when M.F. identified Johnson, she was five to ten feet from the cruiser, and she looked at Johnson "for a couple seconds." (*Id.* at 14-15). Johnson was in the back seat of the cruiser, and the window, which was not tinted, was cracked. (*Id.* at 14). It was dark out, but the lights of the emergency room overhang were on. (*Id.* at 10, 15). Johnson was not handcuffed, and only Johnson and three uniformed officers were present. (*Id.* at 8, 17). Glanemann had no contact with M.F. prior to her identifying Johnson. (*Id.* at 7-9). Glanemann testified that approximately 20

to 25 minutes elapsed from the time of the assault to the time M.F. identified Johnson. (*Id.* at 19). Glanemann identified Johnson for the record at the suppression hearing. (*Id.* at 6).

{¶23} We agree with the trial court that M.F. identified Johnson in an inherently suggestive show-up identification. (Doc. No. 30). However, in light of all of the facts on which the trial court relied in denying Johnson's motion to suppress, we conclude that M.F.'s identification of Johnson was reliable based on the totality of the circumstances and therefore admissible. Applying the first *Biggers* factor, M.F. had multiple opportunities to view Johnson. He first presented himself directly in front of M.F., only about an arm's length away. During M.F.'s 20 to 30-minute encounter with Johnson, Johnson turned his face toward hers "several times." The sun was approaching the horizon, and it was "fairly light out."

{¶24} Second, M.F.'s degree of attention before and during the crime was substantial. M.F. testified in great detail concerning the respective routes that she and Johnson took. She described the streets she was on and the directions she and Johnson were facing at specific times.

{¶25} Third, M.F.'s description of Johnson to the police was accurate. Johnson is a black male with a goatee and approximately five feet, seven inches tall and approximately 300 pounds. When the officers located him, he was

wearing dark clothing, just as M.F. described. In Glanemann's words, Johnson "absolutely" fit the description M.F. gave the police. (Mar. 18, 2013 Tr. at 20).

{¶26} Fourth, M.F. had no uncertainty when she identified Johnson outside the emergency room at St. Rita's. Underneath the well-lit emergency room overhang, M.F. recognized Johnson's face immediately when an officer shined a light on it as he was sitting in the police cruiser. M.F. was "very sure"—or, as she described to one of the officers, "a hundred and ten percent sure"—that Johnson was the person who attacked her.

{¶27} Finally, about 20 to 30 minutes passed between when M.F. first encountered Johnson to the time he attacked her, and then only about 10 to 20 minutes elapsed between when M.F. ran into the Rite Aid and when she identified Johnson. That is a relatively short amount of time. *See State v. Gonzalez*, 10th Dist. Franklin No. 10AP-628, 2011-Ohio-1193, ¶ 17-18 (describing 15 or 30 minutes as "very little time" and concluding that the trial court did not err in denying the defendant's motion to suppress). *See also State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 23, 25 (concluding that it was not reversible error for the trial court to admit a show-up identification that took place "several hours" after the crime).

{¶28} For these reasons, we conclude that the trial court did not err by denying Johnson's motion to suppress.

{¶29} Johnson's first assignment of error is overruled.

{¶30} To facilitate our analysis, we will address the remainder of Johnson's assignments of error out of order.

### Assignment of Error No. IV

**That the convictions of the defendant are against the manifest weight of the evidence and based upon insufficient evidence.**

{¶31} In his fourth assignment of error, Johnson argues that his convictions for attempted rape and kidnapping are against the manifest weight of the evidence and supported by insufficient evidence. Johnson does not dispute that someone kidnapped and attempted to rape M.F. Rather, Johnson argues that he was misidentified as the perpetrator of the offenses and convicted based on "the identification evidence of one person." (Appellant's Brief at 21). According to Johnson, he was "taken in the back of a police car to a hospital and displayed as a guilty, apprehended criminal to a 17 year old girl who had just gone through a horrible, physical attack and when she was in a highly emotional state." (*Id.*). We disagree that Johnson's convictions are against the manifest weight of the evidence and based on insufficient evidence.

{¶32} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio

St.3d 259 (1981), paragraph two of the syllabus, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶33} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing

court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶34} Johnson was convicted of attempted rape in violation of R.C. 2907.02(A)(2) and 2923.02 and of kidnapping in violation of R.C. 2905.01(B)(2). R.C. 2907.02 sets forth the crime of rape and provides, in relevant part: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.02(A)(2). R.C. 2923.02, the attempt statute, provides: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A).

{¶35} R.C. 2905.01 sets forth the crime of kidnapping and provides, in relevant part:

(B) No person, by force, threat, or deception, shall knowingly do any of the following, under circumstances that create a substantial

-15-

risk of serious physical harm to the victim or, in the case of a minor victim, under circumstances that either create a substantial risk of serious physical harm to the victim or cause physical harm to the victim:

* * *

(2)  Restrain another of the other person's liberty.

R.C. 2905.01(B)(2).

**{¶36}** As we mentioned above, Johnson disputes only the issue of identity. Therefore, we will address only the identity element of the attempted-rape and kidnapping offenses. *See State v. Carter*, 2d Dist. Montgomery No. 25447, 2013-Ohio-3754, ¶ 9-12 (addressing only the element of identity because the appellant did not contest the other elements of the offenses). "It is well settled that in order to support a conviction, the evidence must establish beyond a reasonable doubt the identity of the defendant as the person who actually committed the crime at issue." *State v. Johnson*, 7th Dist. Jefferson No. 13 JE 5, 2014-Ohio-1226, ¶ 27, citing *State v. Collins*, 8th Dist. Cuyahoga No. 98350, 2013-Ohio-488, ¶ 19 and *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 11. "[D]irect or circumstantial evidence is sufficient to establish the identity of the accused as the person who committed the crime." *Collins* at ¶ 19, citing *Lawwill* at ¶ 11.

{¶37} At trial, M.F. testified that on November 28, 2012, she was 17 years old and in the eleventh grade at Lima Senior High School. (July 1-3, 2013 Tr., Vol. Two, at 208). She commenced her walk home from school "a little bit" after 4:30 p.m. that day. (*Id.*). As she was walking, a male approached her, came within "half an arm's distance" of her, and began talking to her. (*Id.* at 209). According to M.F., she noticed that the male was black, had a goatee, "was maybe three or four inches taller than [her], so about five-eight/five-nine," husky, "but not like obese," and wearing dark pants and a black jacket. (*Id.* at 210). M.F. testified that despite her telling the male, "No," when he asked if he could walk with her, he continued to walk "a little in front" of her, and they continued to have a conversation, for about a block and a half or two blocks. (*Id.* at 209-212, 278). As they walked, M.F. kept the male in her "line of sight at all times" so she could "keep an eye on him." (*Id.* at 212). According to M.F., the male asked her how old she was and if she attended Lima Senior, and he said that he just moved from Chicago and attended Lima Senior, too. (*Id.* at 210).

{¶38} M.F. testified that she made an excuse to get away from the male, telling him that she was going into The Meeting Place, a business, to see her boyfriend who worked there. (*Id.* at 212). After spending 10 to 20 minutes in The Meeting Place, M.F. left and continued her walk home. (*Id.* at 214-215). M.F. testified that she saw the same male that approached her earlier and that she

"walked straight past him" as if she did not see him. (*Id.* at 215). According to M.F., the male spotted her and, jogging toward her, attempted to get her attention by calling her "honey" and "baby," which made her uncomfortable and concerned for her safety. (*Id.* at 213, 216-217).

{¶39} M.F. testified that the male said he just wanted to be friends and asked if she would go with him to McDonald's. (*Id.* at 217). She agreed and intended to call the police there. (*Id.*). According to M.F., she wanted to walk along the street to McDonald's, and when the male suggested they take an alley, she said she did not want to walk through the alley. (*Id.* at 218). M.F. testified that the male then said, "Damn, what did somebody do to make you like this?" (*Id.* at 218-219). She agreed to go down the alley because it was open on one side, and when they came to an intersecting alley, the male suggested they take it back out to the street and walk along it rather than the alley so she would be more comfortable. (*Id.* at 219).

{¶40} M.F. testified that she agreed, and when they turned into that intersecting alley, the male grabbed M.F.'s arm, started hitting her with his fists, and told her that she was going to "suck his dick." (*Id.* at 220-221). According to M.F., he then moved her from the alley to under a porch of an abandoned apartment building abutting the alley and told her that if she screamed, he would

kill her. (*Id.*). M.F. could not recall how the male moved her from the alley to under the porch. (*Id.* at 221).

{¶41} M.F. testified that under the porch, she was on her knees with the male behind her, and when she attempted to grab onto a wire fence to pull herself up, he told her to sit back down, or else he would kill her with a nearby brick. (*Id.* at 220-221). According to M.F., she sat back down on her heels, and then he turned her around, and she saw that his pants and underwear were down and his penis exposed to her. (*Id.* at 221). According to M.F., the male told her "to suck it and that it would only take five minutes." (*Id.*). M.F. testified that she spun around, covered her head, and started screaming loudly. (*Id.* at 222). According to M.F., when she started screaming, the male started hitting her head, shoulders, and arms, and when she would not stop screaming, "he said, 'Shit,' and he started running away" in the direction from which they came, pulling his pants up . (*Id.*).

{¶42} M.F. testified that she ran to the nearby Rite Aid, and the employees called 911. (*Id.* at 223-224). When the police arrived, M.F. gave them a description of the man who attacked her. (*Id.* at 224-225). M.F.'s father arrived at the Rite Aid and then took M.F. to the emergency room at St. Rita's. (*Id.* at 225). Once there, M.F.'s father told her that the police informed him "that they had somebody for [M.F.] to I.D." (*Id.* at 226).

{¶43} An officer escorted M.F. and her father to the overhang outside the emergency room "where the ambulances pull up" and told M.F. that the officers "had somebody that they wanted [her] to I.D." (*Id.* at 226-228). M.F. testified that one of the officers shined a light on the face of the man, who was in the back of a police cruiser under the well-lit overhang. (*Id.* at 227-229). When M.F. started her walk home from school, it was light out, but by this time, it was dark outside. (*Id.* at 227). M.F. testified that she got a "good look" at the man in the police cruiser and had no doubt that he was the man who attacked her. (*Id.* at 227-229). According to M.F., she told one officer that she "was a hundred and ten percent sure that that was the bastard." (*Id.* at 227).

{¶44} M.F. testified that she was upset and crying at Rite Aid, but by the time she identified the man, she "was starting to calm down" but "still at the end of [her] rope." (*Id.* at 229). M.F. testified that there was no chance that being at the end of her rope "played a factor in to [her] thinking that that was the guy." (*Id.*). M.F. also testified that when she started walking home from school, she had her eyeglasses on, but at the emergency room, she realized she no longer had them on. (*Id.* at 226, 228). Even without her eyeglasses on, she was able to "get a good look" at the man. (*Id.* at 228). During her testimony, M.F. again identified Johnson as the man who attacked her, and she had no doubts about who attacked her. (*Id.* at 231, 248).

{¶45} M.F. also used different-colored markers on State's Exhibit 42, an aerial view of downtown Lima, to demonstrate her and Johnson's whereabouts before, during, and after the attack. (*Id.* at 232-236). M.F. identified several photographs, State's Exhibits 1 through 25, including photographs of the location where she was attacked and of her injuries. (*Id.* at 236-246). She identified State's Exhibit 27 as her coat and State's Exhibit 26 as her eyeglasses, which were damaged and fell off of her face during the attack. (*Id.* at 246-247).

{¶46} On cross-examination, M.F. testified that the man who attacked her looked her in the face when he first approached her and asked her if he could walk with her. (*Id.* at 253). She testified that when the man asked her to go to McDonald's with him after she stopped at The Meeting Place and resumed her walk home, the man was facing her. (*Id.* at 261). According to M.F., he was walking sideways and backwards and a "little bit in front of" her, and the man was "trying to talk to [her] and look [her] in the face." (*Id.*). M.F. testified that when her attacker fled and turned the corner in the direction from which they came, she lost sight of him and did not know where he went. (*Id.* at 262). According to M.F., she could not remember how many times her attacker struck her, but she knew it was multiple blows and that almost every closed-fist blow was to her face or head, or her arms and wrists, which she used to cover her head. (*Id.* at 264). M.F. testified that she and her father were at St. Rita's for "five/ten minutes"

before the police arrived for the identification. (*Id.* at 265). The police arrived "really quickly" after she and her father. (*Id.*).

{¶47} On re-direct examination, M.F. testified that the CT scan performed on her at St. Rita's revealed no trauma in her brain as a result of the attack. (*Id.* at 275-276). M.F. testified that she was approximately two to three feet from the police cruiser outside the emergency room when she identified Johnson as her attacker. (*Id.* at 276-277). According to M.F., she felt no pressure from the officers or her father to identify the person in the police cruiser as her attacker. (*Id.* at 277). M.F. testified that from when she first encountered her attacker to the time her attacker fled, she was able to see his face completely, what he was wearing, and about how tall he was. (*Id.* at 279). She again said that she had no doubt that Johnson was the person who attacked her. (*Id.* at 281).

{¶48} During re-cross examination, M.F. testified that at the time she identified Johnson sitting in the police cruiser outside the emergency room, she was closer to the police cruiser than the "ten/twelve feet" to which Johnson's counsel said she testified in cross-examination.[1] (*Id.* at 281-282). M.F. believed that counsel for Johnson asked her in cross-examination "how far [she] had to travel" to make the identification. (*Id.* at 281).

---

[1] The distance to which M.F. testified during cross-examination is unclear from the record because neither Johnson's counsel nor M.F. spoke in terms of units of measure, just distances between themselves and objects in the courtroom. (*See* July 1-3, 2013 Tr., Vol. Two, at 267).

{¶49} Patrolman Aaron Rode ("Rode") of the Lima Police Department testified that on November 28, 2012 at 5:24 p.m., he responded to the Rite Aid for an assault report and observed M.F. there. (*Id.* at 286-287). Rode testified that M.F. described her attacker to him as "a black male, in his twenties, approximately five feet eight tall, heavy set, he had a goatee, and she said he had a very deep voice." (*Id.* at 289). M.F. also told Rode that her attacker "was wearing a black shirt or jacket and dark colored pants," Rode testified. (*Id.*). About 14 or 15 minutes after Rode arrived at Rite Aid, he broadcasted the description of M.F.'s attacker over the radio. (*Id.*).

{¶50} About 12 or 13 minutes after he radioed the description, Rode heard over the radio that Glanemann and Patrolman Boss ("Boss") were "out on a possible suspect," so Rode went to their location, which was approximately three blocks from where M.F. was attacked. (*Id.* at 290-291); (State's Ex. 42). Rode testified that the suspect appeared to match M.F.'s description of her attacker. (July 1-3, 2013 Tr., Vol. Two, at 291). According to Rode, the suspect "was approximately five eight. He was a black male and appeared to be in his twenties. He was heavy-set. He had a goatee. * * * [H]e had a [deep] voice. He was wearing a black jacket and dark colored pants." (*Id.* at 291-292). Rode testified that the suspect identified himself as "Johnny Johnson" and said he was staying at the Lima Rescue Mission and on his way to McDonald's for dinner. (*Id.* at 292).

**{¶51}** Rode testified that he and the other officers took Johnson to St. Rita's, and he informed M.F.'s father "that when [M.F.] was feeling comfortable and ready to come out [the officers] might have to have her try and identify a possible suspect." (*Id.* at 292-293). According to Rode, M.F. was "very, very positive" that Johnson was the man who attacked her, and the officers asked M.F. "several times" to make sure that she was certain of her identification. (*Id.* at 293). Rode testified that M.F. was "two to three feet away" from the patrol car containing Johnson when M.F. identified him as her attacker. (*Id.* at 294). Rode testified that the officers then arrested Johnson, and the time was approximately 6:05 p.m. (*Id.*). Rode identified Johnson in the courtroom as the person M.F. identified as her attacker. (*Id.* at 295-296).

**{¶52}** On cross-examination, Rode testified that he recalled at least one of the officers shining a flashlight on Johnson's face outside the St. Rita's emergency room at the time M.F. identified Johnson. (*Id.* at 300). Rode testified that no other suspects were brought to St. Rita's for M.F. to identify. (*Id.*).

**{¶53}** Glanemann testified that she and Boss were responding to Rode's radio call that he was handling a sexual assault of a juvenile when they spotted Johnson, who matched the description of the suspect radioed by Rode. (*Id.* at 306). According to Glanemann, "about ten, ten/fifteen minutes" went by between the time Rode radioed the suspect's description and the time she and Boss

encountered Johnson. (*Id.* at 312). Glanemann testified that when she and Boss stopped Johnson, he showed her identification identifying him as Johnny Johnson and told her that he was coming from "the mission" and headed to McDonald's. (*Id.* at 307). Johnson asked why he was being stopped, and Glanemann informed him that there was an assault of a juvenile in the area and that he matched the description of the suspect. (*Id.* at 307). Glanemann testified that Johnson "said that it wasn't him." (*Id.*). Rode arrived at the scene and transported Johnson to the hospital for possible identification by M.F. (*Id.* at 307-308).

{¶54} According to Glanemann, when M.F. exited the hospital, M.F. got within five feet of the cruiser containing Johnson, and Glanemann shined her flashlight on Johnson's face. (*Id.* at 309). Glanemann testified that the emergency room overhang under which the cruiser was parked was "lit up" as well. (*Id.*). According to Glanemann, when M.F. saw Johnson, she identified him as her attacker, and when Glanemann "asked her if she was a hundred percent sure on it," M.F. said "that she was a hundred and ten percent sure it was him." (*Id.*). Glanemann testified that after M.F. identified Johnson, the officers arrested Johnson and took him to the Allen County Sheriff's Office, where Boss swabbed Johnson's hands for DNA. (*Id.* at 309-310). Glanemann identified Johnson during trial as the person she stopped and as the person M.F. identified as her attacker. (*Id.* at 313-314).

{¶55} On cross-examination, Glanemann testified that she could not recall whether the dome light of the cruiser containing Johnson was on at the time M.F. identified Johnson. (*Id.* at 320). She also testified that when she shined the light on Johnson's face, she "stepped back a little bit" from the cruiser and shined her flashlight through the cruiser window. (*Id.* at 321).

{¶56} On re-cross examination, Glanemann testified that she could not remember any glare caused by her shining her flashlight onto the cruiser window. (*Id.* at 325). Rather, Glanemann responded affirmatively when asked if she could see Johnson's "face lit up very well," and she testified that she had "[n]o doubts" that M.F. could also see Johnson's illuminated face. (*Id.*).

{¶57} Detective Scott Leland ("Leland") of the Lima Police Department testified that he was assigned to investigate the assault of M.F. (*Id.* at 326-327). He testified that on November 29, 2012—the day following the attack—he showed M.F. a photograph of Johnson that Leland took because he wanted M.F. to see Johnson's photograph "with a clear head and make sure that was the guy and that she didn't know him and that she didn't confuse him with somebody else." (*Id.* at 330, 369-370). Leland testified that when he "ran a criminal history" on Johnson, he found that Johnson "was from the Chicago area in Illinois and that he had an extensive record in that area." (*Id.* at 341). Leland identified State's Exhibits 35 and 36 as photographs he took on November 29, 2012 of the back of

Johnson's left hand, which was bruised above the middle-finger knuckle. (*Id.* at 345-346).

{¶58} On cross-examination, Leland testified that he ascertained from his conversation with Johnson that Johnson was from Chicago. (*Id.* at 354). Leland identified Defendant's Exhibits A and B as photographs of the back of Johnson's right hand taken at the police department. (*Id.* at 356-359). Leland admitted that although he learned in his November 29, 2012 interview with Johnson that Johnson had a cell phone at the time he was taken into custody, Leland did not attempt to secure the cell phone until the week following that interview. (*Id.* at 353-354, 374-375). By that time, Johnson's cell phone had been released to his family and friends, per his request. (*Id.* at 353-354).

{¶59} Emily Miller ("Miller") of the Ohio Bureau of Criminal Investigation and Identification ("BCI") testified that she received: Johnson's shoes, jacket, and pants; M.F.'s jacket; swabs of Johnson's hands; hair fibers found on Johnson's jacket; and DNA reference standards from M.F. and Johnson.[2] (July 1-3, 2013 Tr., Vol. Three, at 389). Miller testified that she did not notice blood on the swabs of Johnson's hands when she physically examined them, so she prepared the swabs for DNA testing without testing them for blood. (*Id.* at 389-390). She tested a couple of spots on Johnson's shoes for blood, but those tests were

---

[2] The parties stipulated to the chain of custody of the items tested for DNA evidence. (July 1-3, 2013 Tr., Vol. Two, at 382-384).

negative. (*Id.* at 390). Miller tested a stain on the right cuff of Johnson's jacket, which tested positive for blood, and Miller prepared the test swab for DNA testing. (*Id.* at 390-395).

{¶60} Miller's tests of spots on M.F.'s jacket were positive for blood, but she did not submit those test swabs for DNA testing because M.F. "most likely, was the only bleeder." (*Id.* at 396). Miller also "did a blind swab" of the left shoulder area of M.F.'s jacket, though she did not notice anything unusual there, and prepared it for DNA testing because the synopsis of the alleged incident given to Miller indicated that M.F. "was pulled by her left shoulder." (*Id.* at 396-400). Miller's tests of a couple stains on Johnson's pants were negative for blood, so she did not prepare those swabs for DNA testing. (*Id.* at 400). Miller prepared M.F.'s and Johnson's DNA reference standards for inclusion with the other items to be tested for DNA. (*Id.* at 401). Miller did not test the hair fibers found on Johnson's jacket. (*Id.*)

{¶61} Miller admitted on re-cross examination that her analysis did not indicate when the blood was deposited on Johnson's jacket, how old the blood was, or to whom the blood belonged. (*Id.* at 413).

{¶62} Emily Feldenkris ("Feldenkris") of BCI testified that she tested the swab prepared by Miller from the right cuff of Johnson's jacket and that the DNA profile developed from that swab was a mixture consistent with contributions from

Johnson and M.F. (*Id.* at 441-442). According to Feldenkris, M.F. cannot be excluded as a contributor to the DNA from the swab of the stain on Johnson's jacket's right cuff. (*Id.* at 442). She testified that based on the national database provided by the Federal Bureau of Investigation, the proportion of the population that cannot be excluded as possible contributors to the mixture of DNA found on Johnson's jacket is one in 3,529,000 unrelated individuals. (*Id.*). Feldenkris testified that she could not say for sure that it was M.F.'s DNA that was on Johnson's jacket; however, she could say that M.F.'s DNA profile is consistent as being a contributor to the mixture of DNA. (*Id.* at 442-443).

{¶63} Feldenkris testified that she also tested the swabs of Johnson's hands, which resulted in DNA profiles that were mixtures consistent with contributions from Johnson and at least one unknown individual. (*Id.* at 436-438). Feldenkris excluded M.F. as a contributor to those DNA mixtures. (*Id.* at 438). Feldenkris testified that she tested the swab of M.F.'s jacket, which revealed a DNA profile that was a mixture, with the major DNA profile being consistent with M.F. and the partial, minor DNA profile coming from at least two individuals, one of whom was male. (*Id.* at 438-439). According to Feldenkris, these results were not surprising given that M.F.'s coat was a man's coat that M.F. purchased from a thrift store. (*Id.* at 440-441).

{¶64} Feldenkris testified that in her work, she compares a DNA profile from a known DNA reference standard to a DNA profile from an item of evidence "to either include or exclude an individual as being a contributor to that DNA." (*Id.* at 430). In doing so, she generates "a statistic to determine how common or rare a profile is." (*Id.* at 443).

{¶65} On cross-examination, when Johnson's counsel asked whether Feldenkris could, within a reasonable degree of scientific certainty, testify that M.F.'s DNA was on Johnson's jacket, Feldenkris responded, "I can't say that it's one hundred percent this DNA comes from [M.F.]. That's why I generate a statistic." (*Id.* at 467). When asked again, Feldenkris responded, "I can't say for certain that it is from [M.F.]." (*Id.* at 468).

{¶66} On re-direct examination, Feldenkris testified that she could say within a reasonable degree of scientific certainty that M.F.'s DNA is consistent with the DNA found on Johnson's jacket. (*Id.* at 469).

{¶67} After the trial court admitted the State's exhibits into evidence and the State rested, Johnson moved for acquittal under Crim.R. 29, and the trial court denied his motion. (*Id.* at 483-484).

{¶68} Johnson's first witness was Julie Heinig ("Heinig"), assistant laboratory director at DNA Diagnostics in Fairfield, Ohio. (*Id.* at 485-486). Heinig testified that DNA Diagnostics tested the same stained area of the right

cuff of Johnson's jacket that BCI tested, but DNA Diagnostics did not test the same sample as BCI. (*Id.* at 493, 495-496). According to Heinig, the DNA profile from the tested stain on Johnson's coat was a mixture consisting of three or more individuals, and M.F. could not be excluded from that mixture. (*Id.* at 501, 513). Reading from her forensic report, Heinig testified that "[t]he probability of selecting an unrelated individual at random from the population having contributed to the mixed DNA profile obtained * * * from the stain on the right cuff of [Johnson's] coat * * * is approximately one in [230,000] individuals." (*Id.* at 501). Heinig testified that this was more probable than BCI's probability of one in 3,529,000 unrelated individuals. (*Id.* at 501-502).

{¶69} Heinig testified that the respective proportions of the population that BCI and DNA Diagnostics determined cannot be excluded as possible contributors to the mixture of DNA found on Johnson's jacket—one in 3,529,000 and one in 230,000 unrelated individuals—do not indicate within a reasonable degree of scientific certainty that M.F.'s DNA was on Johnson's jacket. (*Id.* at 511-512, 515). According to Heinig, if the proportion is less than one in the number of individuals on the earth—approximately seven billion individuals—then she cannot say within a reasonable degree of scientific certainty that the individual is the contributor of the DNA. (*Id.* at 512). Heinig explained the differences in the data collected and analyzed by BCI and DNA Diagnostics, and she noted that BCI

and DNA Diagnostics did not "get the same DNA profile" from Johnson's jacket. (*Id.* at 502-511).

{¶70} On re-cross examination, Heinig responded negatively when asked if she could "say with any degree of reasonable scientific certainty that * * * Johnson's DNA is on his coat." (*Id.* at 535).

{¶71} Johnson was the final witness. He testified that his hometown is Chicago, Illinois and that he moved to Lima in the middle of August 2012 at the prompting of his girlfriend, who lived in Lima with her parents. (July 1-3, 2013 Tr., Vol. Four, at 547, 549). According to Johnson, on November 28, 2012, he took the bus to the Lima Mall in the morning and "stayed there mostly the whole day," until "five something." (*Id.* at 550-551). Johnson testified that he took the bus back to the Lima Rescue Mission where he was residing "close to five o'clock probably," stayed there "for about a good twenty minutes and smoked a cigarette," then departed for McDonald's. (*Id.* at 551). Johnson was residing at the Rescue Mission because his girlfriend's parents wished that he no longer live with them and their daughter, Johnson's girlfriend. (*Id.* at 548).

{¶72} Johnson testified that on the evening of November 28, 2012, he was wearing black khakis, black dress shoes, a hoodie, and a jacket. (*Id.* at 552-553). He testified that as he was walking to McDonald's, he was stopped by police officers who told him that a young lady was assaulted and that he matched the

description of the suspect. (*Id.* at 554-555). According to Johnson, he "told them it wasn't [him]," but the officers looked at his identification and took him to St. Rita's. (*Id.* at 555).

{¶73} Johnson testified that at St. Rita's, the officers parked "where the ambulances come in." (*Id.*). According to Johnson, M.F. came out of the entrance, stood "like ten feet from [him] in the car," and, as the officers "put a flashlight to the window," responded, "Yes," when the officers asked her if Johnson was the person who attacked her. (*Id.* at 555-556). The officers then arrested Johnson. (*Id.* at 556-557). According to Johnson, he had never seen M.F. before she identified him at St. Rita's. (*Id.* at 556, 561). Johnson testified that he was interviewed by Leland the next morning and told him that he "was texting [his] girl the whole time." (*Id.* at 557). He testified that he was texting with his girlfriend on his cell phone "[l]ike, the whole day" and "[l]ike, every three minutes." (*Id.* at 557-558).

{¶74} Johnson identified State's Exhibit 35 and Defendant's Exhibit A as photographs of his left hand, which he said reflect a scar "on the top part" of his hand that has "been there for a long time." (*Id.* at 558-559). He showed his hands to the jury, along with a "bright pink/red" birthmark on his left eyebrow. (*Id.* at 559-560). Johnson's counsel showed him photographs of M.F. from November 28 and 29, 2012. (*Id.* at 561). Johnson responded, "No, absolutely not," when

Johnson's counsel asked him, "[P]oint blank, did you do that to that young lady?" (*Id.*). Johnson testified that he was nowhere near the alley and abandoned apartment building where M.F. was assaulted. (*Id.* at 562).

{¶75} On cross-examination, Johnson acknowledged that he is from Chicago and that he is "[a]round five foot eight." (*Id.* at 562). He testified that on November 28, 2012, he was in Lima, had a goatee, and was wearing a black coat and black pants. (*Id.* at 562-563). Johnson also acknowledged that he gave Leland permission to look at his cell phone and that he signed a slip authorizing his girlfriend to take his cell phone. (*Id.* at 565). After first responding, "Yea," when asked if he recalled telling Leland that he was at the Lima Mall, Johnson said he could not recall telling Leland if he was at the Lima Mall or not. (*Id.* at 566). Johnson did not remember telling Leland that he was outside the Rescue Mission "from five to six-thirty." (*Id.* at 565). Johnson did not recall Leland telling Johnson during the interview that he saw a bruise on Johnson's hand, nor did Johnson recall telling Leland in response that he slept on his hands the preceding night. (*Id.* at 573-574).

{¶76} After Johnson testified and the trial court admitted Johnson's exhibits, the defense rested, and Johnson renewed his Crim.R. 29 motion for acquittal, which the trial court denied. (*Id.* at 576). Counsel gave their closing

arguments, and the trial court charged the jury. (*Id.* at 584-641). The jury found Johnson guilty of Counts One and Two. (*Id.* at 643).

**{¶77}** We first review the sufficiency of the evidence supporting the identity elements of Johnson's attempted-rape and kidnapping offenses. *See State v. Velez*, 3d Dist. Putnam No. 12-13-10, 2014-Ohio-1788, ¶ 68. In her testimony, M.F. described the multiple opportunities she had to observe her attacker before and during the attack. When M.F. first encountered her attacker on her walk home, he came within "half an arm's distance" of her, and M.F. continued to keep him in her line of sight during their walk together. M.F. gave Rode a specific description of her attacker, and within minutes of the attack, officers located Johnson, who matched M.F.'s description, approximately three blocks from the site of the incident. M.F. identified Johnson as her attacker outside of the emergency room within an hour of the attack. During trial, M.F. once again identified Johnson as her attacker.

**{¶78}** M.F.'s attacker told her during their walk together that he recently moved to Lima from Chicago, and Johnson told Leland that he was from Chicago. The State's expert witness concerning forensic DNA analysis testified that M.F. could not be excluded from the DNA mixture found on Johnson's jacket. She testified that the proportion of the population that cannot be excluded as possible

contributors to the DNA mixture found on Johnson's jacket is one in 3,529,000 unrelated individuals.

{¶79} Viewing this evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could have found the identity element of the attempted-rape and kidnapping offenses proven beyond a reasonable doubt.

{¶80} Having concluded that sufficient evidence supports Johnson's convictions, we next address his argument that his convictions were against the manifest weight of the evidence. Because Johnson disputes only the issue of identity, we will again address only the identity elements of the offenses. We summarized in our discussion of the sufficiency of the evidence above the identity-related evidence weighing in favor of Johnson's convictions. Johnson argues that when M.F. identified Johnson outside of the emergency room, she "had just gone through a horrible, physical attack" and was "in a highly emotional state." (Appellant's Brief at 21). He argues that aside from the suggestive show-up identification, "[t]here was no other corroborating evidence presented in this case * * *." (Id.).

{¶81} While M.F. testified that she was "at the end of [her] rope" and not wearing her eyeglasses when she identified Johnson outside the emergency room, she likewise testified that she got within two to three feet of the cruiser containing Johnson under the well-lit overhang, got a "good look" at Johnson's face as an

officer shined a light on it, and had no doubts that Johnson was her attacker. Rode's and Glanemann's accounts of the identification were consistent with M.F.'s. Johnson discounts this testimony, as well as M.F.'s in-court identification of Johnson as her attacker and Rode's and Glanemann's in-court identifications of Johnson as the person who M.F. identified as her attacker.

{¶82} Johnson overlooks the detailed nature and accuracy of M.F.'s description of her attacker. That description allowed officers to locate Johnson within minutes. Johnson also ignores the importance of the Chicago-related testimony. M.F. testified that her attacker told her that he had just moved to Lima from Chicago. Leland testified that he learned after speaking with Johnson that Johnson was from Chicago. Johnson testified that he moved to Lima from Chicago in mid-August 2012—only three and a half months before the date M.F. was attacked.

{¶83} Johnson argues that neither his nor the State's expert witness concerning forensic DNA analysis could testify within a reasonable degree of scientific certainty that M.F.'s DNA was on Johnson's jacket. However, Johnson overlooks that both expert witnesses testified that they could not exclude M.F. as a contributor to the DNA mixture found on Johnson's jacket. In fact, Johnson's expert witness testified to a one in 230,000 probability of selecting an unrelated individual at random from the population having contributed to the mixed DNA

profile found on Johnson's jacket. The State's expert witness testified to a one in 3,529,000 probability. While the experts' inability to testify within a reasonable degree of scientific certainty that M.F.'s DNA was on Johnson's jacket "weakened the certainty of the DNA evidence, * * * the jury remained free to assign this evidence whatever weight it deemed proper in arriving at the verdict." *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 79.

**{¶84}** Johnson testified that he did not attack M.F. However, Johnson's testimony was underwhelming compared to the evidence that he was M.F.'s attacker. Moreover, because the jury was in the best position to assess the credibility of the witnesses, "we afford great deference to the jury's determination of witness credibility." *State v. V.J.*, 10th Dist. Franklin No. 13AP-799, 2014-Ohio-2618, ¶ 32. For the reasons above, the evidence does not weigh heavily against Johnson's convictions, and we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.

**{¶85}** Johnson's fourth assignment of error is overruled.

### Assignment of Error No. III

**That the State of Ohio committed misconduct in its closing argument thereby prohibiting the defendant from receiving a fair trial.**

**{¶86}** In his third assignment of error, Johnson argues that the State committed misconduct in its rebuttal closing argument by arguing that Johnson had "every motive to lie" in his testimony and that in order to find Johnson guilty, the jury needed to determine that M.F. lied in her testimony. We disagree.

**{¶87}** The test regarding prosecutorial misconduct during closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected the defendant's substantial rights. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 231, citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "In making this determination, an appellate court should consider several factors: (1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton*, 102 Ohio App.3d 28, 41 (8th Dist.1995).

**{¶88}** "Misconduct of a prosecutor at trial will not be considered grounds for reversal unless the conduct deprives the defendant of a fair trial." *Id.*, citing *State v. Apanovitch*, 33 Ohio St.3d 19 (1987) and *State v. Maurer*, 15 Ohio St.3d 239 (1984). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Davis* at ¶ 231, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940 (1982).

**{¶89}** "Parties have wide latitude in their closing statements, particularly 'latitude as to what the evidence has shown and what inferences can be drawn from the evidence.'" *State v. Wolff*, 7th Dist. Mahoning No. 07 MA 166, 2009-Ohio-7085, ¶ 13, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 213. "'A prosecutor may comment upon the testimony and suggest the conclusion to be drawn by it, but a prosecutor cannot express his personal belief or opinion as to the credibility of a witness or as to the guilt of an accused, or go beyond the evidence which is before the jury when arguing for conviction.'" *State v. Manns*, 5th Dist. Richland No. 08 CA 101, 2009-Ohio-3262, ¶ 20, citing *State v. Smith*, 12th Dist. Butler No. CA2007-05-133, 2008-Ohio-2499, ¶ 7. *See also State v. Stober*, 3d Dist. Putnam No. 12-13-09, 2014-Ohio-1568, ¶ 133, citing *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, ¶ 16.

**{¶90}** For example, a prosecutor "can bolster his own witnesses, and conclude by saying, in effect, 'The evidence supports the conclusion that these witnesses are telling the truth.'" *State v. Draughn*, 76 Ohio App.3d 664, 670 (5th Dist.1992). *See also State v. Jeffery*, 2d Dist. Montgomery No. 24916, 2013-Ohio-504, ¶ 20, citing *Draughn*. However, a prosecutor "cannot say, 'I believe these witnesses,' because such argument invades the province of the jury, and invites the jury to decide the case based upon the credibility and status of the prosecutor." *Draughn* at 670, citing *State v. Smith*, 14 Ohio St.3d 13 (1984). *See*

*also Jeffery* at ¶ 20, citing *Draughn*. Similarly, a prosecutor "can say, 'The evidence supports the conclusion that the defendant is lying, is not telling the truth, is scheming, has ulterior motives, including his own hide, for not telling the truth.'" *Draughn* at 670, citing *State v. Strobel*, 51 Ohio App.3d 31 (3d Dist.1988). The prosecutor "may not say, 'I believe the defendant is lying,' for the same reasons as above." *Id.*

{¶91} In his closing argument, counsel for Johnson explained to the jury that the only contested issue in the case was identity—namely, whether it was Johnson who attacked M.F. (July 1-3, 2013 Tr., Vol. Four, at 593-594). At one point, Johnson's counsel suggested that the jury did not "have to think that [M.F. is] lying" to find that the State failed to prove that Johnson attacked M.F. (*Id.* at 594). However, he later said, "She's wrong. It's not him. She says it's him. You heard him testify. 'It's not me. * * *.'" (*Id.* at 595-596). And still later, Johnson's counsel said, "[M.F.] has not lied to you. I don't think she's lied to you." (*Id.* at 602).

{¶92} In her rebuttal closing argument, counsel for the State addressed Johnson's counsel's implication that M.F. was mistaken concerning the identity of her attacker:

> [State's Counsel]: Folks, when you look at the reasons, the motives,
>
> people had in testifying up here, when you look at

all of the evidence, all of these coincidences, the unluckiest guy in the world matched in every single solitary description and word. Think about all those things. Think about [M.F.] sitting on this stand and how direct she was and, again, not one bit of motive to come in here and lie to you. Again, [Johnson's counsel] wants to characterize it as being mistaken. She's an intelligent girl. She's no dummy. She didn't succumb to some plant in her head. She's not the eye witness who thinks they saw somebody in a brief moment. She's the eye witness that walked for several blocks with this individual and who was actually attacked by this individual. The one word that you cannot for a second describe [M.F.] with is liar. Every single solitary shred of evidence backs up everything that she said. Everything. The only piece of evidence that didn't was the self-serving statements of the defendant who has every motive to lie.

In order to find this defendant not guilty you have to choose to believe that [M.F.] got on the stand and lied to you.

[Johnson's Counsel]: Objection.

[Trial Court]: Overruled.

[State's Counsel]: I told you in the beginning, and Judge is going to tell you again, the testimony of one witness, if believed, is proof beyond a reasonable doubt. In this case we do have more than [M.F.]. But, at the end of the day do you believe [M.F.]? Ask yourselves that question, folks. When you do, you'll find that this defendant is, in fact, guilty beyond a reasonable doubt of both the Attempted Rape and Kidnapping of [M.F.]. The State of Ohio is asking you to do just that. Thank you so much for your consideration.

(*Id.* at 626-627).

{¶93} The State's counsel's statements during rebuttal closing argument do not amount to prosecutorial misconduct. She never expressed a personal belief or opinion as to the credibility of M.F. or Johnson or as to Johnson's guilt. Rather,

she instructed the jurors to ask *themselves* whether they believed M.F. The State's counsel permissibly argued that the evidence supported M.F.'s testimony. *See Draughn*, 76 Ohio App.3d at 670. Conversely, she pointed out that the only evidence contradicting M.F.'s testimony was Johnson's testimony, implying that Johnson's testimony was unsupported by the remaining evidence. This was also permissible. *See id.* Finally, it was permissible for the State's counsel to suggest that Johnson's motives to lie are the reasons why Johnson's testimony was inconsistent with M.F.'s testimony and the other evidence. *Id.*

{¶94} We conclude that the State's counsel's remarks in this case were not improper. They were not objectionable, and no corrective instruction was necessary.

{¶95} Johnson's third assignment of error is overruled.

### Assignment of Error No. II

**That the trial court committed error by failing to merge the offenses of kidnapping and attempted rape in this case pursuant to ORC 2941.25.**

{¶96} In his second assignment of error, Johnson argues that the kidnapping and attempted-rape offenses of which he was convicted were allied offenses of similar import and that the trial court erred by not merging them for purposes of sentencing. Specifically, Johnson argues that the actions of M.F.'s assailant "are part of one continuous course of conduct." (Appellant's Brief at

18). According to Johnson, "The physical assault and movement of the victim are all in furtherance of and immediate to the attempt to force the victim to perform an act or [sic] oral sex." (*Id.*). We agree.

**{¶97}** Whether offenses are allied offenses of similar import is a question of law that this court reviews de novo. *State v. Stall*, 3d Dist. Crawford No. 3-10-12, 2011-Ohio-5733, ¶ 15, citing *State v. Brown*, 3d Dist. Allen No. 1-10-31, 2011-Ohio-1461, ¶ 36.

**{¶98}** R.C. 2941.25, Ohio's multiple-count statute, states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

In determining whether offenses are allied offenses of similar import under R.C. 2941.25, the court must first determine whether it is possible to commit both

offenses with the same conduct. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶ 48. "If the multiple offenses can be committed with the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id.* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 50 (Lanzinger, J., dissenting).

**{¶99}** If it is possible to commit the offenses with the same conduct and the defendant did, in fact, commit the multiple offenses with the same conduct, then the offenses are allied offenses of similar import and will merge. *Id.* at ¶ 50. However, "if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each, then according to R.C. 2941.25(B), the offenses will not merge." (Emphasis sic.) *Id.* at ¶ 51. "'The defendant bears the burden to prove entitlement to merger.'" *State v. Love*, 3d Dist. Marion No. 9-13-09, 2014-Ohio-437, ¶ 25, quoting *State v. Forney*, 2d Dist. Champaign No. 2012-CA-36, 2013-Ohio-3458, ¶ 10.

**{¶100}** Here, Johnson was convicted of attempted rape and kidnapping. The State concedes that it is possible to commit attempted rape and kidnapping with the same conduct. (Appellee's Brief at 14). *See State v. Lindsay*, 5th Dist. Richland No. 10-CA-62, 2011-Ohio-1708, ¶ 23, citing *State v. Donald*, 57 Ohio

St.2d 73 (1979), syllabus. Therefore, we will proceed to the second step of the *Johnson* analysis and determine whether the offenses were committed by the same conduct.

**{¶101}** In *State v. Logan*, the Supreme Court of Ohio provided guidance concerning when kidnapping and another offense of the same or similar import will merge:

> In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each pursuant to R.C. 2941.25(B), this court adopts the following guidelines:
>
> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
>
> (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart

from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

60 Ohio St.2d 126, syllabus. *See also Stall*, 2011-Ohio-5733, at ¶ 20-21. The Court in *Logan* added, "Secret confinement, such as in an abandoned building or nontrafficked area, without the showing of any substantial asportation, may, in a given instance, also signify a separate animus and support a conviction for kidnapping apart from the commission of an underlying offense." *Logan* at 135.

{¶102} In *Logan*, as the victim "was walking down the street she was accosted by defendant, a casual acquaintance, at the entrance to an alley." (*Id.* at 126). After the victim refused to accept some pills offered to her by the defendant, the "defendant produced a knife, held it to her throat, and forced her into the alley. Under such duress, she accompanied him down the alley, around a corner, and down a flight of stairs, where he raped her at knifepoint." *Id.* at 127. "Immediately following the rape, defendant released her." *Id.* The Court held that the defendant's "detention and asportation of the victim was incidental to the crime of rape," therefore demonstrating "but a single animus." *Id.* at 135-136. The Court reasoned that "the restraint and movement of the victim had no significance apart from facilitating the rape" and that "[t]he detention was brief, the movement was slight, and the victim was released immediately following the commission of the rape." *Id.* at 135. The Court also said that it could not "find

that the asportation of the victim down the alley to the place of rape presented a substantial increase in the risk of harm separate from that involved in the rape." *Id.*

{¶103} In *State v. Price*, during an evening of consuming beer and swimming in a pond, the appellant asked the victim "if she wanted to engage in sexual intercourse." 60 Ohio St.2d 136, 137 (1979). When she refused, the "appellant threatened to drown her if she did not take a walk with him," but the victim returned to the car. *Id.* "Shortly thereafter, appellant returned to the car, pulled [the victim] from the back seat to an area nearby behind some bushes, forced her to the ground, removed her pants, and raped her." *Id.* In holding "that the rape and the kidnapping * * * were neither committed separately nor with a separate animus as to each," the Court reasoned, "The force by which appellant removed [the victim] from the car to behind a nearby bush to engage in sexual conduct, as required under the rape statute, is indistinguishable from the force by which appellant restrained [the victim] of her liberty, as required under the kidnapping statute." *Id.* at 143. "In addition, there was no act of asportation distinct from the rape either in time or in function." *Id.*

{¶104} In *State v. Collins*, the victim declined Collins's invitation when he "asked if she 'wanted to party,'" but Collins nevertheless "proceeded to follow [the victim] down an alley she was using to get home." 4th Dist. Ross No.

01CA2590, 2002-Ohio-3212, ¶ 3. "Collins came up behind her, put his hand over her mouth, grabbed her around the waist, and threw her to the ground." *Id.* "He beat her repeatedly in the head and raped her, both vaginally and anally." *Id.* "Collins ordered the victim to stay in the alley for five minutes, and he left." *Id.* Despite Collins's order, the victim left the alley "as soon as he was gone." *Id.* at ¶ 25. "The examining doctor testified that the victim had bruises to the right side of her face and torso." *Id.* The Fourth District Court of Appeals concluded that the trial court erred by not merging the kidnapping and rape offenses because "a separate animus did not exist as to each offense." *Id.* at ¶ 26-27. The court reasoned that Collins's "restraint of his victim was merely incidental to the rape, and that Collins did not subject the victim to a substantial increase of harm that was separate and apart from that involved in the rape." *Id.* at ¶ 26.

{¶105} In *State v. Bohannon*, the First District Court of Appeals held that "the trial court erred in sentencing Bohannon for kidnapping and the other charged offenses" because "with respect to each victim, kidnapping was an allied offense of similar import to the other charged offenses and was not committed separately or with a separate animus as to each offense." 1st Dist. Hamilton Nos. C-070859 and C-070860, 2010-Ohio-4596, ¶ 17. For example, Bohannon was found guilty of and sentenced for raping and kidnapping a victim who "testified that he had been walking home when Bohannon approached him on the street, pointed a gun

at him, and directed him up a driveway and behind a house, where Bohannon raped him." *Id.* at ¶ 10. The victim "testified that, from the house, he had been able to see the street he had been walking on." *Id.* Bohannon was found guilty of and sentenced for raping and kidnapping another victim who "testified that he had been walking home when Bohannon approached him, pointed a gun at his head, and forced him down a driveway and down the side of a house to a storage shed next to the house" where Bohannon raped him. *Id.* at ¶ 11. The victim testified that "the shed had not been very far from the road" from which Bohannon took him. *Id.*

{¶106} In *State v. Hogan*, as the victim was "walking home, she heard footsteps behind her. The man approaching her from behind threatened her with a weapon and told her 'don't look at my face or I [will] kill you.'" 10th Dist. Franklin No. 09AP-1182, 2010-Ohio-3385, ¶ 17. The man grabbed the victim from behind, "forced [her] into a wooded area," and sexually assaulted her. *Id.* at ¶ 2. "Later the man told her to perform oral sex on him, which she refused to do." *Id.* at ¶ 18. The Tenth District Court of Appeals held that R.C. 2941.25 "barred [the defendant's] being convicted of both the sexual assaults and the kidnapping" because the incident "was not of long duration," "[a]ll of the restraint and removal of [the victim] was done to expedite the sexual assault," and the trial testimony indicated "no other animus." *Id.* at ¶ 49.

{¶107} In this case, M.F. testified that when she and Johnson began walking down the intersecting alley to get back out to the street on their way to McDonald's, Johnson grabbed her arm, started hitting her on her face with his fists multiple times, and told her that she was "going to suck his dick." (July 1-3, 2013 Tr., Vol. Two, at 220-221). Johnson then "move[d] [her] from the alley to under a porch of the apartment building" that abutted the alley and threatened to kill her if she screamed. (*Id.* at 220). Under the porch, M.F.'s back was to Johnson, and when she attempted to pull herself up with the help of a wire fence, he told her to sit back down or else he would kill her with a brick. (*Id.*). When Johnson turned M.F. around, exposed his penis to her, and told her "to suck it and that it would only take five minutes," M.F. spun around, covered her head, and began screaming. (*Id.* at 221-222). Johnson then started hitting M.F.'s head, shoulders, and arms, and when she did not stop screaming, he fled. (*Id.*).

{¶108} This case bears similarities to *Logan*, *Price*, *Collins*, *Bohannon*, and *Hogan*. Johnson's movement and restraint of M.F. was merely incidental to the attempted rape. Based on M.F.'s testimony, when Johnson first began hitting her in the alley, he made it clear he was attempting to force M.F. to perform fellatio on him. After he began hitting M.F., Johnson moved M.F. to an area under a porch on the exterior of an apparently abandoned apartment building. Once underneath the porch, Johnson threatened to kill M.F. with a brick when she attempted to pull

herself up, exposed his penis to M.F., and ordered her to perform fellatio on her. This sequence of events—and particularly Johnson's stated intentions during the attack—demonstrates that Johnson's restraint and movement of M.F. had no significance apart from facilitating the rape. *See Logan*, 60 Ohio St.2d at 135.

{¶109} Borrowing from the Supreme Court's reasoning in *Price*, the force by which Johnson moved M.F. from the alley to under the porch to attempt to engage in sexual conduct, as required under the rape statute and attempt statute, is indistinguishable from the force by which Johnson restrained M.F. of her liberty, as required under the kidnapping statute. *Price*, 60 Ohio St.2d at 137. There was no act of asportation distinct from the attempted rape either in time or in function. *Id.*

{¶110} Johnson's restraint of M.F. was not prolonged so as to demonstrate a significance independent of the attempted-rape offense. It is unclear from the record precisely how long Johnson's attack of M.F. lasted. However, judging by the times of various events to which M.F. and the officers testified—such as when M.F. commenced her walk home and when Rode responded to the Rite Aid—it is clear that the attack lasted only minutes. More importantly, it is clear from M.F.'s testimony that Johnson restrained M.F. only as long as was necessary for him to attempt to rape her. According to M.F., after Johnson began hitting her in the

alley, he moved her to the area under the porch, and he fled when she would not stop screaming after he ordered her to perform fellatio on him.

{¶111} Johnson's confinement of M.F., while perhaps secretive or in a relatively "nontrafficked area," does not demonstrate a significance independent of the attempted-rape offense. That is, the confinement was merely incidental to the attempted rape taking place at the time of Johnson's movement and confinement of M.F. Moreover, the confinement in this case was no more secretive than the confinements in *Logan*, *Price*, *Collins*, *Bohannon*, and *Hogan*. The area under the porch to which Johnson moved M.F. was outdoors and faced a parking area that was behind the abandoned apartment building and at the intersection of two alleys. (*See* State's Exs. 1, 42). In *Logan*, the defendant forced the victim "down the alley, around a corner, and down a flight of stairs." 60 Ohio St.2d at 127. In *Price*, the defendant pulled the victim from the back seat of a car "to an area nearby behind some bushes." 60 Ohio St.2d at 137. In *Collins*, the defendant put his hand over the victim's mouth and threw her to the ground in an alley "in the early morning hours." 2002-Ohio-3212, at ¶ 3. In *Bohannon*, the defendant directed one of his victims "up a driveway and behind a house," and he forced another victim "down a driveway and down the side of a house to a storage shed next to the house." 2010-Ohio-4596, at ¶ 10, 11. In *Hogan*, the defendant forced the victim "into a wooded area." 2010-Ohio-3385, at ¶ 2.

{¶112} Nor was Johnson's movement of M.F. "substantial so as to demonstrate a significance independent of" the attempted-rape offense. *Logan*, 60 Ohio St.2d 126, syllabus. It is unclear from the record precisely what distance Johnson moved M.F. However, the abandoned apartment building under whose porch Johnson moved M.F. was nearby and abutted the alley in which Johnson first began attacking M.F. M.F.'s markings on the aerial map introduced by the State at trial suggest that the distance was less than half a block and less than the length of a building on the other side of the alley from the apartment building. (State's Ex. 42). Therefore, it does not appear that M.F. was moved any further than the victim in *Logan*, for example. *See* 60 Ohio St.2d at 127. And as in *Logan*, Johnson was on foot when he moved M.F. *See id.*

{¶113} Finally, the asportation and restraint of M.F. did not subject her to "a substantial increase in risk of harm *separate and apart* from that involved in the underlying crime" of attempted rape. (Emphasis added.) *Logan* at syllabus. Once again, based on M.F.'s testimony, from the moment Johnson began hitting M.F. to the time he fled, "[a]ll of the restraint and removal of [M.F.] was done to expedite" the attempted rape. *Hogan*, 2010-Ohio-3385, at ¶ 49. Therefore, the risk of harm to which M.F. was subjected was not separate from that involved in the attempted rape. The State argues that by restraining M.F. under the porch, Johnson subjected her to a substantial increase in risk of harm "because she could have been beaten

even more severely, beaten with a brick, and possibly even killed * * *."
(Appellee's Brief at 15). Johnson's restraining M.F. in a relatively secluded
location did not itself substantially increase her risk of harm. Indeed, the victims
in *Logan*, *Price*, *Collins*, *Bohannon*, and *Hogan* were restrained in relatively
secluded locations.

{¶114} For these reasons, we hold that the kidnapping and attempted-rape
offenses of which Johnson was convicted were allied offenses of similar import.
Therefore, the trial court erred by not merging those offenses for purposes of
sentencing.

{¶115} Johnson's second assignment of error is sustained.

{¶116} For the foregoing reasons, the judgment of the Allen County
Common Pleas Court is affirmed in part and reversed in part, and the matter is
remanded to the trial court for further proceedings consistent with our disposition
of the second assignment of error.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**ROGERS, J., concurs separately.**

{¶117} I concur with the result reached by the majority. I write separately
because I believe the majority failed to recognize a serious misstatement by the

prosecutor in closing argument which warranted a corrective instruction from the trial court.

**{¶118}** As quoted by the majority, the prosecutor told the jury: "The one word that you cannot for a second describe [M.F.] with is liar. * * * In order to find this defendant not guilty you have to choose to believe that [M.F.] got on the stand and lied to you." Maj. Op. ¶ 92.

**{¶119}** To lie is "to make an untrue statement with the intent to deceive" or "to create a false or misleading impression: convey an untruth." *Webster's Third New International Dictionary* 1305 (2002). To say that a statement is a lie is to characterize the person making it as a liar – one who is *intentionally* untruthful.

**{¶120}** The State cannot shift the burden of proof to the defendant. *State v. Sparks*, 3d Dist. Union No. 14-01-03, 2001 WL 929374, *3 (Aug. 16, 2001). In this case, the identity of the offender was disputed. The victim testified that the defendant was the perpetrator. However, the victim could be wrong about her identification of the defendant without being untruthful. She might have simply been mistaken as to the identity, or confused because of the manner in which she was first presented with a suspect. In fact, that was the argument of the defense.

**{¶121}** A jury might be willing to conclude that a victim was mistaken about the identity of her attacker. A jury might not be satisfied that the victim could positively identify the defendant as her attacker. But a jury might well be

reluctant to render a verdict which implies that they are finding the victim to be a liar. To tell the jury that they must find that she intentionally lied to them is not correct. The defendant is not required to prove that the State's witnesses are lying. Indeed, the defendant is not required to prove anything – that burden is squarely on the State. The prosecutor's comments amounted to telling the jury that if it doubted that the victim was lying, it would be required to find the defendant guilty. This increases the possibility that the sympathetic victim will receive the benefit of the doubt, when it is the defendant that is entitled to the benefit of any reasonable doubt. Thus, the statement impermissibly shifted the burden of proof.

{¶122} Furthermore, for the prosecutor to tell the jury that to find the defendant not guilty they would have to "choose to believe" that the victim lied to them is the same as telling the jury that the prosecution believes her so you should too! This is equivalent to a statement of personal belief and/or opinion as to the credibility of the witness and is improper. *See State v. Williams*, 79 Ohio St.3d 1, 12 (1997).

{¶123} I believe that the trial court should have instructed the jury that this statement by the prosecutor was an incorrect statement of the law, and that the jury was entitled to find that M.F. was mistaken without the additional burden of finding her to be a liar. However, improper statements by prosecutors during closing arguments are only grounds for reversal where "it so taints the proceedings

as to deprive the defendant of a fair trial." *State v. Manley*, 3d Dist. Allen No. 1-11-04, 2011-Ohio-5082, ¶ 14.

{¶124} Considering the totality of the evidence and arguments of counsel, I do not find the error sufficiently prejudicial that it would warrant reversal in this case.

**SHAW, J., concurs in part and dissents in part.**

{¶125} I concur with the lead opinion entirely in the analysis and disposition of the first, third and fourth assignments of error. I do not concur with anything in the separate concurring opinion. I respectfully dissent as to the disposition of the second assignment of error by the majority regarding the merger of the kidnapping and attempted rape convictions in this case.

{¶126} The victim testified that the appellant started hitting her in the alley, told her she was going to "suck his dick" then "moved" her from the alley into the location under the porch and told her that if she screamed he was going to kill her. (Tr. 220). She then found herself down on the ground under the porch but was facing away from the appellant, who she testified was "behind me and I can't see what he's doing." (Tr. 220). The victim then testified that the porch had a "wire fence enclosing it" and that when she put her hand on the fence to "pull myself up on my knees" that appellant then told her to "get back down or else I'll kill you"

and then threatened to kill her, first with a "stick" and then the appellant stated "No I'll kill you with this brick here." (Tr. 220) In response, the victim stated she then sat "back down on my heels." (Tr. 221)

{¶127} It is notable that the threat to kill the victim with the brick was issued *prior* to the initiation of any attempted sexual conduct by appellant, was not issued in conjunction with a demand for any sexual act as in "turn around and suck my dick or I'll kill you with this brick" but instead was made solely *to prevent her from breaking free from her restraint* as she attempted to get up on her knees. At that point the victim was clearly being "restrained of her liberty by threat of force under circumstances that either created a substantial risk of serious physical harm or caused physical harm" exactly as alleged in the charge of Kidnapping set forth in Count Two of the Indictment, and with a separate animus related solely to the Kidnapping charge sufficient to justify the trial court's determination of same.

{¶128} With the victim still down on her heels, the appellant then "turned" the victim around to face him as he now stood in front of her with his pants down and penis exposed whereupon he demanded fellatio from her (Tr. 221), thus clearly establishing the elements of Attempted Rape exactly as charged in Count One of the Indictment. However, in response, the victim then testified "I spin around and I cover my head and I start screaming" thus, remaining on the ground but again facing away from the appellant. (Tr. 221)

{¶129} The appellant then began beating her about the face, shoulders and arms with his fists for a period of time until the appellant eventually just said "shit," pulled up his pants and fled. (Tr. 222) There is no indication in the testimony of a further threat or demand for any sexual conduct while this beating was being administered nor is there any indication that the appellant tried to physically grab her head or hair, turn her around again to face him or otherwise attempted to forcibly impose fellatio upon her, which at that point was not likely to be physically possible while he was beating her with his fists on her head and shoulders from behind.

{¶130} Even assuming arguendo that the appellant's initial threat to kill the victim with a brick so close in time to his initial declaration of intent to force sexual conduct upon her in the alley, could only be incorporated into the single animus of the attempted rape, the beating administered to the victim by the appellant at the end of the incident as set forth above - inflicted upon a restrained victim down on her heels and facing away from the appellant with her head covered - is in my view, far more reasonably construed as an independent venting of violent frustration upon the victim *after* the failure of the attempted rape, rather than as part of any continuing effort or purpose to forcibly compel or attempt a sexual act.

{¶131} In any event, it is my view that both the foregoing threat to kill the victim with a brick prior to the initiation of any sexual coercion and the later physical assault upon a victim already restrained and subdued by the appellant after a failed attempt at sexual coercion, each subjected the victim to a substantial increase in risk of harm separate and apart from that involved in the attempted rape, sufficient to support a finding of separate animus by the trial court under the *Logan* test cited by the majority.

{¶132} In addition, I believe the instances of intermittent threats and violence in the present case are distinguishable from a number of the cases cited by the majority in support of merger, many of which seem to focus upon a single and continuous threat, force or restraint *used to physically accomplish and actually perform the particular sexual act* being forced upon the victim.

{¶133} For all of the foregoing reasons, I believe the record is sufficient to support the trial court's determination of a separate animus for Kidnapping and Attempted Rape under the language of the specific statutory sections set forth in Count One and Count Two of the Indictment in this case. Accordingly, I would overrule the second assignment of error and affirm the conviction and sentence of the trial court in its entirety.

/jlr